**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |
|---|---|
| _____ ) | |
| ASRC FEDERAL TECHNOLOGY ) SOLUTIONS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 23-1738 |
| ) | |
| THE UNITED STATES, ) | Filed: January 12, 2024 |
| ) | |
| Defendant, ) | Re-issued: January 30, 2024* |
| ) | |
| and ) | |
| ) | |
| OSI VISION LLC, ) | |
| ) | |
| Defendant- ) Intervenor. ) | |
| _____ ) | |

**OPINION AND ORDER**

In this post-award bid protest, Plaintiff ASRC Federal Technology Solutions, LLC ("AFTS") contends that the National Aeronautics and Space Administration ("NASA") improperly awarded a contract for technical workforce training and curriculum services to Defendant-Intervenor Osi Vision LLC ("OSI"). Specifically, AFTS alleges that NASA's evaluation of the Mission Suitability and Cost/Price factors, as well as its best value determination, was flawed. Before the Court are the parties' dispositive motions and Plaintiff's request to supplement the administrative record with extra-record facts. As explained below, the Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record and Motion to

_____

\* The Court issued this opinion under seal on January 12, 2024, and directed the parties to file any proposed redactions by January 23, 2024. As the parties did not propose any redactions, the Court reissues the opinion publicly in full.

Supplement the Administrative Record and **GRANTS** the Government's and OSI's Cross-Motions for Judgment on the Administrative Record.

## I.   BACKGROUND

### A.   The Solicitation

On October 14, 2022, NASA issued Request for Proposals 80GRC022R0013 ("RFP" or "Solicitation") for the Technical Workforce Education and Expertise Development Services ("TWEEDS") program to support the Office of the Chief Engineer's Academy of Program/Project & Engineering Leadership Knowledge Services ("APPEL KS").[1]  Admin. R. 421, ECF No. 27.[2]  APPEL KS is the internal resource for the training and development of NASA's technical workforce, including engineering and systems engineering, as well as program management professionals.  AR 422.  The purpose of the TWEEDS program is to provide NASA with technical workforce training and curriculum, professional development resources, knowledge sharing initiatives, and strategic communications.  AR 421.

The procurement was conducted as a small-business set-aside pursuant to Federal Acquisition Regulation ("FAR") part 15 procedures.  AR 364–65.  The RFP contemplated award of a hybrid fixed-price, cost-plus-fixed-fee, and cost-no-fee contract to provide services for a 60-day phase-in period on a fixed-price basis, followed by a 1-year base period and four 1-year options, each consisting of fixed-price, cost-plus-fixed-fee, and cost-no-fee components.  AR 335–36.  According to NASA's Independent Government Cost Estimate ("IGCE"), the total estimated cost/price for TWEEDS was roughly $44 million.  AR 71.

---

[1] NASA amended the RFP twice.  AR 480, 482.  It posted answers to questions regarding the final RFP on October 28, 31, and November 4, 2022.  AR 484, 485, 486.

[2] For ease of reference, citations to the administrative record refer to the bates-labeled page numbers rather than the ECF page numbers.

The TWEEDS contract is a consolidation of two existing contracts: (1) NNC 16BA06B/ NNC16TA99T ("GRC contract"), performed by FSPRIME, LLC (d/b/a Fedstar, LLC), and (2) NNK16OL05C ("KSC contract"), performed by ASRC Federal Data Solutions, LLC ("AFDS"), a sister subsidiary of AFTS.  AR 334, 1288.  The KSC contract primarily involved supporting APPLS KS with curriculum development and implementation, while the scope of the GRC contract primarily involved supporting administrative functions.  AR 112–13.  The scope of the consolidated TWEEDS contract includes both the curriculum development and administrative services, as well as additional services not previously provided under either predecessor contractor. AR 421.  NASA sought contract consolidation in part to increase efficiencies and reduce overall costs.  AR 115.  The agency's Determinations and Findings ("D&F") stated that TWEEDS' "contract cost savings is a direct result of the consolidation . . . .  Currently, there is a program manager on each contract.  Under TWEEDS, there will only be one program manager, and one additional [Work Year Equivalent ("WYE")] has been removed."  AR 114.

**B.      Evaluation of Proposals**

The RFP advised that NASA would make an award on a best value tradeoff basis, considering the following factors: (1) Mission Suitability; (2) Cost/Price; and (3) Relevant Experience and Past Performance.  AR 413.  The Mission Suitability factor was more important than the Past Performance factor, which was more important than the Cost/Price factor.  AR 419. When combined, the Mission Suitability and Past Performance factors were significantly more important than the Cost/Price factor.  *Id.*  The RFP requested that proposals be submitted in four volumes: (I) Mission Suitability; (II) Cost & Price; (III) Relevant Experience and Past Performance; and (IV) Contract Information.  AR 393.  The RFP notified Offerors that each of these volumes must "stand alone and not require reference to another volume."  *Id.*  The RFP also

notified offerors that the agency's evaluation would be "on the basis of material presented and substantiated in [their] proposals and not on the basis of what may be implied," further advising that "[a] lack of clarity or specificity in an Offeror's proposal may be interpreted as a lack of understanding on the part of the Offeror and/or inability to demonstrate adequate qualifications." AR 412.

With respect to the Mission Suitability factor, the RFP described how NASA would evaluate the proposals:

> The Government will evaluate the Offeror's Mission Suitability response to determine whether it clearly demonstrates how the Offeror will meet or exceed all requirements of the Statement of Work (SOW) and [RFP]. The Government will evaluate the precise, factual, detailed and complete information submitted responsive to the instructions and relevant to the requirements of the SOW. The Government will evaluate the Offeror's capabilities, resources, plans, organizations or other information that is relevant to accomplishment of the SOW. The Government's evaluation of the Offeror's response to this section will be based on written information provided in the Offeror's proposal. Information incorporated by reference will not be evaluated.

AR 414–15. The RFP specified that this information would be evaluated for "its overall level of understanding, reasonableness, and completeness." AR 415.

The RFP advised that the Mission Suitability factor was divided into three sub-factors, which the Source Evaluation Board ("SEB") would numerically score out of 1,000 total points: (A) Management Approach (600 points); (B) Technical Approach Scenario 1 – Curriculum (250 points); and (C) Technical Approach Scenario 2 – Knowledge (150 points). AR 415–17. Additionally, the Management Approach sub-factor was divided into eight equally weighted matter areas: (1) Organizational Structure; (2) Key Positions and Qualifications; (3) Labor Skill Mix; (4) Total Compensation Plan; (5) Performance Management Plan; (6) Portfolio Management Plan; (7) Subcontractor Plan; and (8) Phase-In Plan. *Id.* Each Mission Suitability sub-factor would receive a corresponding adjectival rating of Excellent, Very Good, Good, Fair, or Poor. AR 413.

Based on these findings, NASA would assess the Mission Suitability factor for significant strengths, strengths, weaknesses, significant weaknesses, and deficiencies.  AR 414.

Of particular importance to this protest, Management Approach Matter Area 1, Organizational Structure, instructed offerors to "[d]escribe the Offeror's organization structure, including reporting relationships, and the proposed approach to meet the technical, business, safety, health, environmental and any other requirements specified in the [SOW]."  AR 397.  It further required that the offeror's organizational chart "include staffing levels and a functional statement for each department."  *Id.* The RFP did not set requirements for staffing levels or organizational structure, and instead gave the offeror the ability to use its judgment in formulating the management approach.  *Id.* ("The offeror should demonstrate an integration of personnel to meet all the management requirements of the SOW as well as any back-office functions that team members will draw upon (e.g., accounting, graphics, etc.).").  Indeed, when an offeror asked during Questions and Answers ("Q&A") whether NASA could provide a level of effort for the procurement, the agency responded: "No, Offerors are to propose based on their understanding of the [SOW] and expertise in the area."  AR 484.

For Management Approach Matter Area 2, Key Positions, the RFP instructed offerors to "identify the positions and qualifications that they determine are key to the successful performance of this contract," providing (among other details) a "supporting rationale why they have selected the proposed key positions."  AR 397.  And for Management Approach Matter Area 3, Labor Skill Mix, the RFP instructed offerors to "describe their proposed labor skill mix (excluding Key Positions) which shall include proposed labor categories, skill level, and hours in order to meet the requirements as

specified in the [SOW]." *Id.* (requiring offerors to describe their "rationale on size, recruitment, maintaining and retaining staff throughout the life of the contract").

With respect to the Cost/Price factor, the RFP indicated that NASA would not numerically score cost/price, nor would it assign an adjectival rating. AR 417. NASA provided a price summary template to potential offerors for completion. AR 458. The RFP instructed that NASA would use the price analysis techniques under FAR 15.404-1(b), which include (1) comparison of proposed prices received in response to the solicitation; (2) comparison of proposed prices with the IGCE; and (3) analysis of the pricing information provided by each offeror. AR 416. The agency's evaluation of price would also include an analysis for unbalanced pricing pursuant to FAR 15.404-1(g). *Id.* Finally, NASA would conduct cost realism and reasonableness analyses, which include (1) comparing the offerors' rates proposed in response to the solicitation; and (2) comparing the proposed rates to historical rates for the same or similar items purchased by the Government. AR 417. For the purposes of evaluation, the agency would assess firm-fixed-price, cost-plus-fixed-fee, and cost-reimbursable-pricing together. AR 401. By contrast, in making the source selection decision, the Source Selection Authority ("SSA") would use the evaluated cost and price. AR 417. The total proposed cost and price consisted of the phase-in period, base period, four option periods, and one six-month extension. AR 416–17.

## C.     The Evaluation and Award

NASA received timely proposals from three offerors, including AFTS and OSI. AR 1289. On February 16, 2023, the SEB presented its evaluation findings to the SSA. AR 1212. The following is a summary of the findings for AFTS's and OSI's respective proposals.

| **Element** | **AFTS** | **OSI** |
|---|---|---|
| Mission Suitability (1000 points) | 338 points | 528 points |
| Sub-factor A: Management Approach (600 points) | Poor 120 points | Fair 240 points |
| Sub-factor B: Technical Approach Scenario 1 Curriculum Quality (250 points) | Fair 113 points | Excellent 238 points |
| Sub-factor C: Technical Approach Scenario 2 Knowledge Matrix (150 points) | Good 105 points | Fair 50 points |
| Proposed Cost | $38,389,775 | $60,338,855 |
| Probable Cost (no adjustments made) | $38,389,775 | $60,338,855 |
| Relevant Experience and Past Performance (Level of Confidence) | High | Moderate |

AR 1228, 1286.

On April 19, 2023, the SSA issued a Source Selection Statement ("SSS"), in which he concurred with the SEB evaluators' assessment, AR 1288, 1296, and summarized their detailed explanations for the ratings assigned to each offeror's proposal, *see* AR 1288–1302. As relevant here, for Management Approach Matter Area 1, Organizational Structure, AFTS was rated "poor" with two weaknesses and one significant weakness. AR 1239–41; *see* AR 1293. Specifically, the SEB assigned the following weakness to AFTS:

> Summary Statement: The Offeror's proposed organizational structure and staffing levels are too lean to meet government requirements.
>
> Rationale:
> - The Offeror's proposed organizational structure and staffing levels for meeting the [SOW] requirements outline such a limited number of team members that it would introduce performance risk if any of the proposed staff attrit or retire.
> - The Offeror combines strategic communications leadership with podcast moderation and production responsibilities and does not provide a rationale for this approach.

- The Offeror identifies only 2 [WYE] to support Knowledge Services and identifies only 3.3 WYE in the Training and Support Group [("TSG")], which is also tasked with "logistics support across the entire TWEEDs [sic] program". Impact: Staff limitations of this severity would inhibit innovation, flexibility, and reduce the likelihood that the contractor can successfully perform activities, thereby increasing the risk of unsuccessful contract performance.

AR 1239; *see* AR 1293. The SEB assigned a significant weakness to AFTS for its Management

Approach Matter Area 2, Key Positions, proposal with the following reasoning:

> Summary Statement: The Offeror's proposed key positions are inconsistent with the Offeror's overall management approach.
>
> Rationale:
- The Offeror identifies five key positions: Program Manager, Deputy Program Manager, Business Manager, Curriculum Manager, and Knowledge Services Lead. The rationale for the identified positions is inconsistent with the management approach and the organizational structure, which highlights the importance of the Strategic Communications Group [("SCG")] and [TSG].
- In its proposed Organizational Structure, the Offeror identifies the [SCG] as central to the structure. The Strategic Communications Lead position is coupled with a Podcast Moderator and Producer position. Given the emphasized importance of communications in the Offeror's management approach, there is insufficient rationale to suggest that the identified key positions would be able to meet these responsibilities.
- In its proposed Organizational Structure, the Offeror identifies the [TSG] as the cornerstone for logistics support. Given this structure, there is insufficient rationale on the lack of inclusion of this role as a Key Position.

> Impact: Inconsistency between Organizational Structure and Key Positions limits the Government's ability to assess proper skills and experience for important positions, thereby appreciably increasing the risk of unsuccessful contract performance.

AR 1240; *see* AR 1293. Finally, the SEB assigned AFTS a weakness for its Management

Approach Matter Area 3, Labor Skill Mix, with the following reasoning:

> Summary Statement: The Offeror's proposed labor skill mix does not include sufficient detail on the labor categories or the rationale for labor categories.

Rationale:
- The Offeror indicates that estimates were based on estimating workshops and applied their staffing methodology to "maintain cost effective service"; however, the Offeror provides insufficient data or accompanying information to identify the roles and the level of expertise required to perform them successfully.
- Non-key positions have no narrative explanation and there is no evidence of assessment of skill levels. The designation of two Curriculum Leads at the Expert Level and a Leadership Development Program Lead at the Advanced Level, for instance, suggests that the Offeror does not prioritize sufficient staffing for the professional development program. Identifying only one Journeyman Webmaster/Graphics Design position presents risk in maintaining a robust, mature website and partnership with NASA information technology resources.
- The Offeror asserts that the plan provides efficiencies, for example by creating an automated dashboard of a current manual process. The Offeror provides insufficient rationale for this assertion.

Impact: Insufficient information on labor categories and insufficient rationale for labor category application limits the government's insight into Offeror approach and effectiveness, thereby increasing the risk of unsuccessful contract performance.

AR 1241; *see* AR 1293.

Separately, OSI received a strength for its Management Approach Matter Area 1,

Organizational Structure, as follows:

Summary Statement: The Offeror's proposed organizational structure emphasizes flexibility, responsiveness to government priorities, and cross[-]functional staff.

Rationale:
- The Offeror's proposed organizational structure and proposed approach to meeting the [SOW] requirements emphasizes flexibility and responsiveness to changing government priorities, highlights cross-functional staffing, and enhances the Program Manager's central integration and prioritization function with additional lines of communication.
- The Offeror proposes an organizational structure with hierarchical transparency and accountability for all tasks. Roles and responsibilities are defined with clarity.
- The Offeror notes that backup program management is provided when the primary manager is absent and to supplement support as needed.

Impact: The organizational structure's focus on flexibility and responsiveness to government priorities enables easier alignment with changes in program direction, thereby increasing the likelihood of successful performance.

AR 1247; *see* AR 1294.

With respect to the Cost/Price factor, the SSA noted that "AFTS's proposal offered the lowest proposed cost/price," and that "AFTS's probable cost/price was the lowest of all three (3) Offerors."  AR 1293.  In contrast, OSI's proposal offered the highest cost/price of the three offerors.  AR 1295.  As such, the SSA performed a tradeoff analysis and provided the following rationale for selecting OSI for the award of the TWEEDS contract on a best value basis:

> Because [OSI]'s highest-rated non-cost price proposal is not also the lowest cost price proposal, determining best value requires a trade-off between the qualitative advantages of the higher-rated technical proposals and the quantitative advantages of the proposals that offer a better cost/price.  In conducting this analysis, I remain mindful that Mission Suitability and Relevant Experience and Past Performance, when combined, are significantly more important than Cost/Price.
>
> In comparing [OSI]'s highest rated technical proposal with AFTS's lowest cost/price proposal, I find that [OSI]'s proposal offers the better value. The probable cost/price of AFTS's proposal is significantly and substantially less than the probable cost/price of [OSI]'s proposal, but I cannot overlook the risks identified in AFTS's lean organizational structure and staffing and the potential that multiple groups, important to AFTS's approach, may be inadequately supported by key personnel.  Not only does [OSI]'s proposal not present these concerns, but it affirmatively offers a flexible and responsive organizational structure and, more impressively, an outstanding response to Sub-factor B, in which it demonstrates superior comprehension, introduces innovative enhancements, and provides a systematic and thorough process for resource and staffing alignment, strengths that AFTS's proposal does not match.  In this acquisition, where non-cost price factors are significantly more important than Cost/Price these technical advantages justify the substantial cost premium of [OSI]'s proposal, which offers the better value.

AR 1301.

On May 29, 2023, the Contracting Officer ("CO") sent offerors post-award notifications, identifying OSI as the successful offeror and notifying the unsuccessful offerors of their right to a post-award debriefing.  AR 1306–10.  AFTS requested a debriefing, which NASA conducted virtually on June 8, 2023.  AR 1311–88.

**D.    Procedural Background**

1.    <u>GAO Protest</u>

On June 14, 2023, AFTS filed a protest with the Government Accountability Office ("GAO") challenging the agency's evaluation and award decision.  AR 1485.  The protest raised issues involving the agency's technical, past performance, and cost/price evaluations, as well as the agency's source selection decision.  *Id.*  On September 21, 2023, the GAO denied AFTS's protest in its entirety.  AR 1992.  It held, in relevant part, that the agency did not err by assigning a weakness to AFTS's organizational structure for its "too lean" proposed staffing levels, or by assigning AFTS a significant weakness on the basis that AFTS's proposed key positions were inconsistent with its overall management approach, and that NASA properly evaluated the reasonableness of OSI's price.  *See* AR 1997–2000, 2004–05.

2.    <u>The Present Protest</u>

On October 5, 2023, AFTS filed its Complaint in this Court.  *See* Pl.'s Compl., ECF No. 1.  On November 3, 2023, AFTS filed a Motion for Judgment on the Administrative Record and Motion to Supplement the Administrative Record.  *See* Pl.'s Mot. for J. on Admin. R., ECF No. 36; Pl.'s Mot. to Suppl. Admin. R., ECF No. 35.  On the same day, the Government and OSI filed Cross-Motions for Judgment on the Administrative Record.  *See* Def.'s Cross-Mot. for J. on Admin. R., ECF No. 32; Def.-Intervenor's Cross-Mot. for J. on Admin. R., ECF No. 33.  The motions are now fully briefed.  *See* Pl.'s Reply, ECF No. 40; Def.'s Reply, ECF No. 38; Def.-Intervenor's Reply, ECF No. 37; Def.'s Resp. to Mot. to Suppl. Admin. R., ECF No. 39; Pl.'s Reply to Mot. to Suppl. Admin. R., ECF No. 42.  With the parties' consent, on November 30, 2023, the Court provided an oral ruling denying AFTS's Motion for Judgment on the Administrative Record and Motion to Supplement the Administrative Record and granting the

Government's and Defendant-Intervenor's Cross-Motions on the Administrative Record.  Order at 1, ECF No. 45.

## II.  LEGAL STANDARDS

### A.    Motions for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC") governs motions for judgment on the administrative record.  Such motions are "properly understood as . . . an expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).  Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.    Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ."  28 U.S.C. § 1491(b)(1).  In such actions, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the Administrative Procedure Act.  *Id.* § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).  Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.  To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error").  A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

In reviewing an agency's procurement decisions, the Court may not substitute its judgment for that of the agency. *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations").  The disappointed bidder "bears a heavy burden," and the CO is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa*, 238 F.3d at 1332–33 (citations and quotes omitted).  This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983).  A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."

*Impresa*, 238 F.3d at 1333.  "[T]hat explanation need not be extensive."  *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

In a bid protest, the Court reviews questions of law de novo.  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  The interpretation of a solicitation or of procurement regulations presents such questions.  *See id.*; *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed. Cir. 1986).  The Court of Federal Claims does not afford deference on questions of law.  *See VS2, LLC v. United States*, 155 Fed. Cl. 738, 767 (2021).

## C.      Standing in a Bid Protest

To establish standing in a bid protest, the plaintiff is required to demonstrate that it is an interested party, meaning it "is an actual or prospective bidder[ ] and . . . possesses the requisite direct economic interest."  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006).  To show a "direct economic interest," the plaintiff must show that it was prejudiced by the Government's alleged errors by proving it had a "substantial chance" of receiving the contract.  *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002).  Put differently, a plaintiff has standing to pursue a bid protest if it demonstrates that "but for the error[s]" challenged in the protest it "would have had a substantial chance of securing" the contract at issue.  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); *see Alfa Laval*, 175 F.3d at 1367.

In *CACI, Inc.-Federal v. United States*, the Federal Circuit held that § 1491(b)(1)'s interested party requirement presents a question of statutory standing that does not implicate this Court's subject-matter jurisdiction.  67 F.4th 1145, 1151 (Fed. Cir. 2023).  According to *CACI*, the Court may thus choose—but is not required—to make an initial, "preliminary determination ('substantial chance') with respect to the plaintiff's chances of securing the contract" before

addressing the merits.  *Id.* at 1152.  As the Circuit further observed, the statutory standing issue and the merits issue may be overlapping, especially where the plaintiff's protest challenges the agency's evaluation of its own bid.  *Id.* at 1152–53 (citing *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012)).

### III.  DISCUSSION

AFTS challenges NASA's award to OSI on four grounds.  It alleges that: (1) NASA's assignment of Mission Suitability weaknesses to AFTS and strengths to OSI was irrational; (2) NASA's cost/price evaluation was irrational; and (3) NASA's best value determination was irrational.  The Court concludes that AFTS's protest is unavailing on all grounds, as NASA rationally evaluated AFTS's and OSI's proposals.

### A.    NASA's Evaluation of the Mission Suitability Factor Was Rational.

With regard to the Mission Suitability factor, AFTS challenges four of the agency's adjectival ratings: (i) NASA's assignment of a weakness to AFTS's organizational structure; (ii) NASA's assignment of a significant weakness to AFTS's key positions; (iii) NASA's assignment of a weakness to AFTS's labor categories; and (iv) NASA's assignment of a strength to OSI for its organizational structure.  The Court addresses each argument in turn.

AFTS alleges that NASA's assignment of a weakness to AFTS's organizational structure was irrational because the agency unreasonably concluded that AFTS's staffing levels were "too lean" to meet the stated government requirements.  ECF No. 36 at 27.  According to AFTS, its staffing was reasonably based on the agency's D&F as applied to the historical staffing levels on the predecessor contracts.  *Id.* at 27–31.

The Solicitation stated that each offeror's proposal "shall provide a detailed Mission Suitability response that clearly demonstrates how the Offeror shall meet or exceed all

15

requirements of the [SOW] and RFP." AR 396. Further, the RFP provided that each offeror was to describe its "organization structure, including reporting relationships, and the proposed approach to meet the technical, business, safety, health, environmental, and any other requirements specified in the [SOW]." AR 397. Importantly, the RFP left it up to each offeror to propose a staffing level. *Id.* This was reinforced in an agency response to a specific inquiry during Q&A regarding anticipated staffing levels, in which NASA expressly declined to "provide a level of effort for this opportunity" and instead advised offerors "to propose [staffing levels] based on their understanding of the [SOW] and expertise in the area." AR 484. Offerors were therefore put on notice that organizational structure would be governed by RFP and SOW requirements, not by the staffing levels of the predecessor contracts being consolidated to create TWEEDS.

AFTS's organizational structure proposed a staffing level of 15 WYE. ECF No. 36 at 30. NASA assigned a weakness to AFTS under this matter area because "such a limited number of team members . . . would introduce a performance risk if any of the proposed staff attrit or retire." AR 1249. NASA also observed that AFTS had "identifie[d] only 2 WYE to support the Knowledge Support Group and identifie[d] only 3.3 WYE in the [TSG]," even though that latter group was "tasked with logistics support across the entire TWEEDS program." *Id.* Altogether, NASA determined that "[s]taff limitations of this severity would inhibit innovation, flexibility, and reduce the likelihood that the contractor can successfully perform activities, thereby increasing the risk of unsuccessful contract performance." AR 1239. The agency's assessment of AFTS's proposed staffing levels and its potential risk to performance are matters committed to NASA's discretion and expertise, which the Court will not second guess. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). AFTS's mere disagreement with NASA's judgment is not

sufficient to show that NASA's evaluation was arbitrary or capricious.  *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

Nonetheless, AFTS argues that NASA failed to account for the historical staffing data on the two predecessor contracts and the staffing levels contemplated by the agency's consolidation D&F.  ECF No. 36 at 27–31.  Beginning with the latter, the D&F stated that the agency anticipated certain "cost savings" as a result of consolidating the predecessor contracts under a single TWEEDS contract.  AR 114.  These savings were due to, among other things, the estimated reduction of two WYE positions.  *Id.*  AFTS contends that it reasonably based its proposed staffing level of 15 WYE on the actual workforce levels for the two predecessor contracts, minus this staff reduction of two WYE.  ECF No. 36 at 18–19.  According to a declaration submitted by AFTS with its Motion to Supplement the Administrative Record, the actual staffing level between the two prior contracts was 17 WYE.  Decl. of Nancy Anderson ¶¶ 5–7, ECF No. 35-1.  AFTS contends that NASA based its evaluation on an inaccurate assumption of 18 WYE in the IGCE (three more than AFTS's proposal).  ECF No. 35 at 3.  In response, NASA reiterates that the RFP—which governs the agency's evaluation—did not instruct offerors to propose a staffing level based on historical data, but rather instructed offerors to propose staffing solutions to meet the requirements of the RFP and SOW.  ECF No. 32 at 22–23.  On this point, the agency prevails.

While it is understandable why AFTS would utilize historical data known to it from its own experience to build its approach to staffing levels on the consolidated contract, the RFP made clear that offerors should base their organizational structure on the RFP and SOW requirements, not the staffing levels of the predecessor contracts.  A similar argument was rejected in *Centerra Group LLC v. United States*, 135 Fed. Cl. 587, 605 (2017).  In *Centerra*, the protestor argued that the procuring agency arbitrarily found the awardee's staffing levels sufficient because it ignored

that the proposed staffing hours were below the actual staffing hours on the existing contract.  *Id.*
The court held that the agency was not obligated to compare the awardee's staffing plan to the
existing staffing level.  *Id.*  As in this case, the RFP at issue in *Centerra* did not indicate the agency
would make such comparison; instead, it "advised offerors that their staffing plans should be based
on the information provided in the solicitation."  *Id.* (noting further that the agency "declared that
the offerors did not need to know the existing staffing levels to prepare their proposals").

AFTS has provided no authority supporting the notion that in a procurement that defines
no level of effort an agency must base its internal staffing estimate on historical staffing data.
AFTS points only to the D&F (ECF No. 36 at 30), contending that the D&F is comparable to a
source selection plan and that "failure to follow" the plan "is, by its very nature, an arbitrary act."
ECF No. 40 at 12 (citing *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571 (2006)).
But the D&F, unlike the source selection plan at issue in *Fort Carson*, did not "provide[] operating
rules for the evaluators."  *Fort Carson*, 71 Fed. Cl. at 592.  While it was made public in connection
with the procurement, the D&F was not incorporated by reference into the RFP and did not purport
to impose any suggested or required staffing levels, nor did it identify the total number of WYE
from which the two WYE were subtracted.  *See* AR 114.   A plain reading of the D&F indicates,
at best, only that two WYE could be eliminated as redundant or unnecessary through consolidation.
*See* AR 114.  Moreover, that AFTS was able to perform the predecessor contract with less WYE
(on account of unfilled positions) is not necessarily a predictor of its ability to successfully perform
requirements under the consolidated contract.  In short, AFTS's decision to focus on historical
staffing to propose a lower WYE was an approach with which evaluators could agree or disagree,
as NASA was not required to compare proposed staffing plans to then-existing contract levels.

Accordingly, it was reasonable for NASA to assign a weakness to AFTS based upon insufficient personnel in its organizational structure.

AFTS additionally argues under this matter area that NASA overlooked AFTS's rationale for combining the strategic communications leadership and podcast moderation positions. ECF No. 36 at 29–30. As further basis for assigning a weakness to AFTS's organizational structure, the SEB faulted AFTS for not providing a rationale for this approach. *See* AR 1239. What AFTS points out as its rationale, however, is limited and vague at best. The proposal does not explain how AFTS proposed to accomplish under one role the work designed to be accomplished by two different positions. Instead, it contains only generic statements about how AFTS would align the "specialized skill mix of our staff to all requirements across the program," thus optimizing personnel, providing cost savings, and allowing employees to expand their skills. AR 508. These statements fall short of explaining how AFTS's approach would be able to meet the responsibilities intended for both positions. AFTS argues that NASA failed to consider that, as the incumbent on the predecessor contract, its staff had "actual knowledge of what the work entails." ECF No. 36 at 30. But that point was not expounded on in the proposal, and the RFP advised offerors that the evaluation would be based solely on the content of proposals and "not on the basis of what may be implied." AR 412. Therefore, NASA provided a rational basis for its assessment of AFTS's organizational structure weakness.

AFTS's second contention is that NASA irrationally assigned a significant weakness to AFTS's management approach by concluding that its "'proposed key positions [were] inconsistent with [its] overall management approach[.]'" ECF No. 36 at 31 (quoting AR 1240). As with the staffing levels, the RFP left it up to the offerors to choose key positions. Specifically, the RFP instructed offerors to "identify the positions and qualifications they determine are key to the

successful performance of this contract" and provide "a supporting rationale" for why they selected those key positions.  AR 397.  Pursuant to the RFP, the agency would evaluate this matter area based on the following: "(i) The Offeror's proposed positions and qualifications that they determine are key to the successful performance of this contract; (ii) The relevant skills, education, certifications, and experience of each proposed position; and (iii) The Offeror's rationale for selecting their proposed key positions."  AR 415.  The SEB noted that AFTS identified "five key positions: Program Manager, Deputy Program Manager, Business Manager, Curriculum Manager, and Knowledge Services Lead."  AR 1071; *see* AR 1240.  But it also concluded that "[t]he rationale for the identified positions is inconsistent with the management approach and the organizational structure" proposed by AFTS.  *Id.*  By way of explanation, the evaluators observed that although AFTS identified the "[SCG] as central to [its] structure," AFTS paired the lead position of this group with a podcast moderator position and failed to identity a key position for the SCG.  AR 1240.  The SEB also noted that while AFTS had identified the TSG as the "cornerstone for logistics support" AFTS did not explain why it did not propose a key position for this group either.  AR 1240; *see* AR 1071.

AFTS argues that NASA failed to consider information provided in its proposal. Specifically, AFTS explains that it: (1) proposed to merge the SCG with the Program Management Office ("PMO") and thus SCG would be "under the PMO;" and (2) proposed the Deputy Program Manager, which is a key personnel position, to "oversee" the TSG.  ECF No. 36 at 32–34; *see* AR 507–08.  The record, however, shows that NASA did not fail to consider the information included in AFTS's proposal.  Rather, it found that AFTS did not clearly provide key positions for the two groups *despite the information provided*.  AR 1240.  With respect to the SCG, AFTS failed to explain which, if any, of the PMO key personnel would be supporting the group, nor was such

information included in AFTS's organizational chart.  AR 507–08.  The section of AFTS's proposal listing the skills, responsibilities, and rationale for each of the three PMO key personnel also did not identify SCG as falling under their responsibilities.  AR 506–07.  With respect to the TSG, it was unclear whether the Deputy Program Manager would serve as a key position for that group simply because he was overseeing the group.  AR 507–08.  Further, the rationale for proposing the Deputy Program Manager as a key position did not include any mention of the TSG. AR 509.

In sum, NASA's assignment of a significant weakness to AFTS was rational because the RFP required offerors to "provide supporting rationale [as to] why they have selected the proposed key positions," AR 397, and AFTS's proposal was vague, short on detail, and included an organizational chart that failed to list which, if any, key positions would support the SCG and TSG (both of which AFTS identified as central to its management and logistics support services), *see* AR 507–08.  AFTS bore the burden "to submit a well-written proposal with adequately detailed information that allow[ed] for a meaningful review" by NASA.  *Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States*, 89 Fed. Cl. 735, 744 (2009).  NASA was not required to infer such information from proposals where the information was inadequately provided or omitted.  *See Mission1st Grp., Inc. v. United States*, 144 Fed. Cl. 200, 213 (2019) ("It is axiomatic that the burden is on the offeror 'to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency.'" (quoting *Structural Assocs.*, 89 Fed. Cl. at 744)).  Indeed, the RFP warned offerors that "lack of clarity or specificity" in a proposal could be interpreted as the offeror's lack of understanding.  AR 412.  The Court sees nothing irrational about NASA's conclusion that the inconsistencies between the organizational structure and key position aspects of AFTS's proposal limited the agency's "ability

to assess proper skills and experience for important positions, thereby appreciably increasing the risk of unsuccessful contract performance." AR 1240.

Relatedly, NASA did not, as AFTS contends, consider unstated evaluation criteria when it concluded that AFTS's proposal contained insufficient rationale for not assigning a key position to the SCG. Although AFTS characterizes this as an arbitrary requirement to "justify the negative," ECF No. 36 at 34, it is merely a different side of the same coin. The RFP required offerors to "provide supporting rationale why they have selected the key proposed positions," so that the agency could assess the offerors' chances of "successful performance of th[e] contract." AR 397. Based on AFTS's proposal, NASA could neither assess which key positions identified were responsible for the SCG and TSG, nor could it understand why AFTS decided not to identify a key position for two of its most important groups. Its concern about a lack of rationale for AFTS's key positions was reasonable and did not apply unstated evaluation criteria.

AFTS next contends that NASA's assignment of a weakness to AFTS's labor categories was irrational. The RFP required NASA to evaluate Labor Skill Mix by assessing each offeror's "proposed labor categories, skill levels, and hours[.]" AR 415. With respect to AFTS, the agency acknowledged that AFTS's staffing methodology was based on estimated workshops but concluded that AFTS provided "insufficient data or accompanying information to identify the roles and the level of expertise required to perform them successfully." AR 1241. NASA found that this insufficient information limited the agency's "insight into [AFTS's] approach and effectiveness, thereby increasing the risk of unsuccessful contract performance." *Id*. AFTS argues that the agency deviated from the terms of the Solicitation by requiring additional explanation beyond the "proposed labor categories, skill levels, and hours" for its labor skill mix. ECF No. 36 at 36 (citing AR 510). This argument fails.

NASA's explanation was not an attempt to graft unstated criterion into the RFP, but rather an adherence to the RFP's requirement that each element was to be evaluated for the "overall level of understanding, reasonableness, and completeness."  AR 415.  Determining whether AFTS's labor categories provided adequate detail demonstrating its approach and effectiveness, and whether any lack of information presented a performance risk, is a matter within the agency's judgment and expertise.  Regardless of the initial individual evaluations, both the consensus SEB and SSA findings assessed a weakness for AFTS's insufficient detail and rationale.  *See DM Petroleum Operations Co. v. United States*, 115 Fed. Cl. 305, 314 (2014) ("[T]he initial individual ratings of SEB members have 'little bearing on [a] protest' when the SEB reaches a consensus rating." (alteration in original) (quoting *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 247–48 (2011)).  The Court will not second guess this exercise of judgment.

Finally, AFTS contends that NASA's assignment of a strength to OSI for OSI's organizational structure was irrational because it rests on the incorrect presumption that proposing more WYE than what the agency estimated would result in more "flexibility" as opposed to greater inefficiency.  ECF No. 36 at 32–33.  For all the same reasons explained above regarding AFTS's "too lean" organizational structure weakness, this challenge fails too.  Moreover, the record reflects that NASA's evaluation of OSI was based not solely on the quantity of WYE proposed, but on OSI's "proposed organization structure [that] emphasized flexibility, responsiveness to government priorities, and cross-functional staff."  AR 1247.  This qualitative assessment is consistent with NASA's procurement strategy, which indicated the agency was "willing to pay more for a contract that offer[ed] increased value through an innovative approach, superior technical performance, or lower risk, either individually or in any combination."  AR 31.  As such, the Court is satisfied that NASA provided a "rational connection between the facts found" and the

agency's assignment of a strength.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

AFTS also alleges that NASA's evaluation of OSI's organizational structure showed disparate treatment of offerors because, while OSI received credit for "backup program management," AFTS did not receive similar credit for its Deputy Program Manager.  ECF No. 36 at 33.  AFTS contends that a Deputy Program Manager and a "backup program manager" are nearly identical or substantially indistinguishable positions.  *Id.*  Similarity in title alone, however, does not mean the duties of each position are equivalent.  Rather, OSI explained *how* its backup program management would achieve cross-functionality and described *how* its organizational structure ensured support for Program Management and offered additional expertise to support government requirements.  AR 910–12.  In contrast, AFTS did not provide an explanation to demonstrate how its Deputy Program Manager would provide similar support.  AR 506–07.  It stated only that the deputy would "fill in when [the] [Program Manager] is unavailable."  *Id.*  Accordingly, AFTS has not shown that the agency unreasonably downgraded its proposal for approaches that were "substantively indistinguishable" from or nearly identical to those contained in other proposals.  *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).

B.      **NASA's Evaluation of the Cost/Price Factor Was Rational.**

With regard to the Cost/Price factor, AFTS contends that NASA's price evaluation, cost evaluation, and total cost/price evaluation were irrational.  Each argument is without merit.

AFTS first contends that NASA's price reasonableness evaluation was irrational and inconsistent with the FAR's requirements.  The FAR gives the agency discretion to choose the test it uses when conducting a price reasonableness analysis to ensure that the agency pays a fair and reasonable price.  FAR 15.404-1(b)(1).  Here, NASA relied on three techniques prescribed in the

FAR to evaluate price reasonableness: (1) comparison of proposals received in response to the Solicitation; (2) comparison of proposals to the IGCE; and (3) an analysis of the pricing provided by the offerors.  AR 416; *see* FAR 15.404-1(b)(2).  The record reflects that NASA satisfied these evaluation criteria by comparing the offerors' price proposals to each other and to the IGCE.  AR 1259–61.  In addition, as part of the price reasonableness analysis, the agency also analyzed the factors that created differences in the proposed prices.  AR 1261–64.  NASA concluded that AFTS proposed the lowest price of all offerors, which was 13% under the IGCE, but it also identified a cost risk in the proposal because AFTS underestimated PMO staffing in comparison to its proposed management approach.  AR 1261, 1298–99.

AFTS's objection to NASA's evaluation in large part stems from the same arguments as its objection to the "too lean" weakness—for example, that the IGCE was premised on inaccurate staffing numbers and that no rational explanation can be given for choosing a higher priced proposal where one justification for consolidating the predecessor contracts was to reduce costs.  *See* ECF No. 36 at 22–23.  As previously explained, neither the RFP nor any other cited authority required NASA to base the IGCE or any other evaluation benchmark on actual historical staffing data; rather, NASA expressly declined to provide a level of effort for the TWEEDS program and directed offerors to propose their own staffing solutions to meet the requirements of the SOW and RFP.  *See* AR 397, 484.  Further, offerors were on notice that "[t]he Cost/Price factor was significantly less important than the combined importance" of the other two factors.  AR 419.  This was consistent with NASA's stated "willing[ness] to pay more for a contract that offer[ed] increased value."  AR 31.  As cost/price alone was not the sole motivator for contract consolidation, nor the most important evaluation factor, NASA's selection of a higher priced contract was not per se irrational.  Similarly, the assessment of a cost risk posed by AFTS's

proposal, which was consistent with the weakness assessed for AFTS's lean staffing, was not irrational. AFTS may disagree that it was reasonable for NASA to pay a higher price for the perceived value added by OSI's approach, but mere disagreement is not enough to sustain AFTS's protest. *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011) ("When an officer's decision is reasonable, neither a court nor the GAO may substitute its judgment for that of the agency."). Given the significant discretion afforded to procurement agencies, the Court will not second guess NASA's judgment.

AFTS next contends that NASA's cost evaluation was irrational. The RFP provided that a cost realism analysis would be conducted to assess the reasonableness and realism of the proposed costs by: "(i) comparing the Offerors' rates proposed in response to th[e] solicitation and (ii) comparing the proposed rates to historical rates for the same or similar items purchased by the Government." AR 417. As required, the agency plainly compared the offerors' proposed rates to each other, as well as to the IGCE and various historical data. AR 1259. The RFP did not require a more detailed analysis of each element of the offerors' proposed costs—for example, the costs for providing courses—in part because the RFP provided plug-in numbers for several cost components (leaving few cost variables for offerors to address). AR 405–06. The Court will not hold NASA's cost analysis to a higher standard than that provided for in the RFP. *See Quanterion Sols, Inc. v. United States*, 152 Fed. Cl. 434, 447 (2021).

AFTS lastly contends that NASA failed to evaluate whether OSI's total cost/price was unreasonably high. The SEB, however, documented an analysis of each offeror's total cost/price in its findings. AR 1259–64. And the SSA acknowledged that AFTS's cost/price proposal was "significantly and substantially less" than OSI's cost/price proposal, but that "where non-cost/price factors are significantly more important than [c]ost/[p]rice" the technical advantages of OSI's

proposal justified its "substantial cost premium." AR 1301. Again, AFTS's belief that OSI's Cost/Price proposal was clearly unreasonable for the work to be performed cannot be substituted for the agency's judgment. *See Turner Constr.*, 645 F.3d at 1383. The SSA squarely addressed and rationally explained his evaluation of each offeror's total cost/price.

C.    **NASA's Best Value Determination Was Reasonable.**

Just as the Court finds nothing arbitrary or capricious about the challenged evaluation findings, it likewise finds nothing irrational about NASA's best value determination, which was thoroughly explained in the SSA's decision. *See* AR 1300–02. In a best value procurement, agencies have even greater discretion to determine the proper award than if the contract was awarded upon the basis of cost alone. *Galen Med. Assoc. Inc. v. United States*, 369 F. 3d 1324, 1330 (Fed. Cir. 2004). Here, the SSA's best value analysis considered the relevant evaluation factors and provided a rational basis for his conclusion that OSI's proposal presented the best value to the Government based on its technical advantages. Accordingly, AFTS's protest must fail.[3]

D.    **No Injunctive Relief Is Warranted Because AFTS Fails on the Merits.**

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Because AFTS has not succeeded on the merits of its protest, no injunctive relief is warranted in this case. *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373,

---

[3] Consequently, the Court need not determine whether AFTS was prejudiced by NASA's evaluation of proposals or best value determination. *See Bannum*, 404 F.3d at 1351.

1384 n.7 (Fed. Cir. 2022); *ANHAM FZCO v. United States*, 149 Fed. Cl. 427, 439 (2020) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018)).

**E.      Plaintiff's Motion to Supplement and the Government's Request to Strike Are Denied.**

AFTS also filed a Motion to Supplement the Administrative Record with a declaration from Nancy S. Anderson, a manager at ASRC Federal (AFTS's and AFDS's parent company), regarding the number of staff performing under the predecessor contracts. *See generally* ECF No. 35-1. The Federal Circuit has consistently held that, under the APA standard applied in bid protest cases, the focal point of judicial review should be the administrative record already in existence, not a new record made initially in the reviewing court. *Axiom Res. Mgmt.*, *Inc. v. United States*, 564 F. 3d 1374, 1379 (Fed. Cir. 2009). Supplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review. *Id.* As noted above, AFTS moved to supplement the record with a declaration setting forth facts about the actual historical staffing levels of the predecessor contracts, arguing that this information is necessary to give the Court a "full and complete" understanding of the inaccuracies that caused AFTS's proposal to be deemed "too lean." ECF No. 35 at 1. Because NASA was not required to evaluate proposals based on the levels of effort for the predecessor contracts, the absence of the facts presented in AFTS's declaration does not frustrate judicial review. The Court therefore denies AFTS's motion.

In its opposition to AFTS's motion, the Government moved to strike the declaration at issue and any reference to the declaration in AFTS's dispositive briefing. *See* ECF No. 39 at 5–6. The Court finds that denying AFTS's motion is sufficient, and that there is no need to formally strike the referenced materials. A motion for judgment on the administrative record is essentially "an expedited trial on the record," *Bannum*, 404 F.3d at 1356, in which the Court is the trier of

fact.  The Court is capable of reviewing, and indeed has reviewed, AFTS's arguments without considering or relying on the declaration or those portions of AFTS's briefs that discuss the declaration.  Accordingly, the request to strike is denied.

## IV.  CONCLUSION

For the reasons set forth above, the Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 36) and Motion to Supplement the Administrative Record (ECF No. 35) and **GRANTS** the Government's Cross-Motion for Judgment on the Administrative Record (ECF No. 32) and Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record (ECF No. 33).  The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after January 26, 2024, unless the parties submit **by no later than January 23, 2024**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**

Dated: January 12, 2024                                   _/s/ Kathryn C. Davis_____
                                                         KATHRYN C. DAVIS
                                                         Judge